Good morning. Benjamin Brown for the Dairy Farmer Appellants. In this case, I'd like to reserve five minutes for rebuttal, please. Go ahead to the clock. Okay. May it please the Court, this case involves the propriety of application of the filed-rate doctrine to claims arising out of the misrepresentation. Thank you, Counsel. What is, if one were to try to find in one spot the best summary as to how the milk prices are set, where would one look? It wouldn't be certainly your brief because it doesn't, you really don't discuss it at all. So where would one look? Well, the best place to look for description of the way that milk is priced would be the AMS website on the USDA website. That part of the record here? There are portions of the USDA's website that are in the record. The entirety of their, I'm sorry. Let me ask, would the Arkansas Cooperative Association v. Department of Agriculture case, both in the district court level and the appellate level, be a better source? I am familiar with that description of the milk pricing, and I believe, my recollection was that it was accurate. I don't know if I would say it's a better place, but it's certainly a place that's easily accessible and does go into the pricing to some degree. All right. Thank you. The case involves the application of the filed-rate doctrine, the misreporting of nonfat dry milk prices to the USDA. There's no dispute that the misreporting at issue happened. In fact, the USDA has acknowledged that and gone further than acknowledging. It's actually analyzed the effects that that misreporting had on subsequently published. Can I also help focus your argument? I noticed that Judge Ishii was also the district judge in the Gallo case. Yes, Your Honor. He discusses it in his opinion extensively and distinguishes that aspect of Gallo where our court found that there were some aspects where your kind of argument had some traction. He said not in this case. So could you just, and since he was the same judge in this case, obviously, as you argue, would you keep in mind the structure of our Gallo analysis as to when a filed-rate doctrine applies in this kind of case? I understand that was gas, this is milk. Yes. It seems that the USDA's role in this is somewhat comparable to FERC's. In fact, maybe stronger, but whatever. However you address it, I just keep in mind that Gallo seems to be a major case for this case. Yes, Your Honor. I appreciate that. And in fact, rather than kind of take that into account throughout the presentation, perhaps I'll just address it right now in some detail. The process that this Court went through in Gallo, Gallo was fairly recent. It was, I think, a 2007 decision. It was one of the more lengthy analyses of the filed-rate doctrine this Court has issued. And the way that that case was. Actually, it was 2010. Oh, sorry. I'm sorry. No, I'm looking at your case. No, you're right. The wrong one. That's right. The structure of that opinion was that the Court first analyzed whether there was a statutory grant of authority to FERC to substantively regulate the energy prices at issue. And, you know, the Court went through some lengthy history and determined, yes, there was a statutory grant of authority and that FERC had authority to be regulating in that area. Although they didn't have authority at the wellhead. So they, but they did have authority in other ways, oversight and the like. Yes, that's correct. And that, that's correct. The second, so the second question that the Court had to wrestle with was, was the statutory grant of authority actually being exercised given the status of the, given the process that was in place to regulate the market rates? Of course, this deregulation is a transition towards market rates. And, of course, this case also involves the use of market-based rates in pricing in a somewhat regulated context. So it's, it is an alias. The Court said, and this is at page 1040 of the, of the opinion, 503F3, 1040, a failure by FERC to exercise its statutory authority to approve rates would cast doubt on the underlying premise of the filed rate doctrine. And then it went on to, to discuss whether in fact FERC was exercising its statutory authority. And it talked about how FERC had made affirmative representations that it looked at the market power of the various sellers in the industry before it determined to grant a permit to those sellers. And then even after those first sales occur, they maintained, and this is a quote from page 1042, they maintained ongoing oversight of the market and took corrective responses to evidence of market manipulation. So you contrast what FERC was saying about how it was using its statutory authority in that case to what the OIG said about how USDA was using its grant of statutory authority in this case. The, the OIG report, this is at excerpts of record, page 113, talks about how there was a statutory grant of authority, but the rulemaking necessary to actually give that statutory grant of authority any effect had not been completed and wasn't completed until, I think it was July or, or, or after that in 2007. So there was, and they, and they said we, we therefore didn't have a process to confirm the accuracy of the, the prices at issue. So this is basically toward your meaningful review argument, isn't it? That goes towards the meaningful review argument. That's correct. But there is a second, there's a, there's one final point on Gallo I would like to make that goes to the other issue, which is, which, which is what, what happens if a rate isn't approved or is disapproved. And that is FERC's, the, the Gallo analysis didn't just end there. Gallo went one step further and it said, look, it looks like some of Plante's claims in this case involve misreporting of rates. And to the extent that there's, and this is a quote. Well, let me stop you. I mean, there are actually, obviously there are two issues. One is whether or not you, you apply the file rate doctrine here. And secondly, even if you apply it, what, what happens in this particular scenario? Absolutely. Okay. So addressing the first point, however, the meaningful review argument that you're making, isn't, wasn't that argument more or less rejected in square D? Well, there's, there's, so there's, there's, there's two ways one can interpret meaningful review. You can't just use a yes or no or I can't answer the questions asked. I'm sorry. The, to the extent that meaningful review, Your Honor, means that there has to be an affirmative meaningful review of each rate, it may have been rejected, yes, by square D. But to the extent that meaningful review means, the authority to meaningful review, means that they actually had, that the regulatory agency implicated had the regulatory authority to be meaningfully reviewing these rates at all. That hasn't been rejected. But the agency here clearly had the authority to create for itself that if they so desired. But they didn't, they didn't do it until 2007. They had the power to do it. They just didn't elect to do it at that point in time. That doesn't mean to say they don't have the power to do it. Yes, Your Honor. That is correct. There was certainly statutory grant of authority to the agency to pursue rulemaking, to give itself the authority to, to be checking the accuracy of the rates. And there's no dispute that the agency didn't do it. So there was no process of actual review of the accuracy of these prices. That was not, that was not going on. And so the question becomes, is it, is it a matter for, is it a matter of, there's a statutory grant of authority. So whether they do it or not, they've got the authority to do it. And that's how you apply the Filed Rate Doctrine? Or is it a matter of, is. Cases which still hold that, aren't there? Well, the most, I mean, in Gallo, for example, you know, I just, as I said, Gallo, the Court, the Court said, after analyzing how much oversight was actually being exercised by the agency, the Court said because FERC has not abdicated its responsibilities but has acted, albeit with a light hand, to authorize just and reasonable rates, the Filed Rate Doctrine continues to preempt any rate-setting activities. Now, in that case, Judge Fletcher filed a concurring opinion where she said, you know,  She said, look, we have to be careful because if we, here FERC has said we are exercising authority, we are checking the reasonableness of these rates. But if we go one step further and start applying the Filed Rate Doctrine to cases where there is no actual authority being exercised to check these rates, then the doctrine has become unmoored from its fundamental justification of deferring to actual agency discretion.  Okay, but are you, are you depending on the fact that pre-2007 we should not apply it or are you arguing that even 2007 onward we should not apply it? Pre-2007. Okay. So you would concede that Filed Rate Doctrine would be appropriate once the USDA starts exercising its authority. Now, it did exercise its authority in this case, in this matter, but it did not undo the rates. Isn't that correct? No, Your Honor. The Court did, I mean, the agency. It didn't in response to the issues in this case? Maybe it won't. Yeah. But I thought it adopted some regulations for monitoring, maybe not just this case, but monitoring, auditing, and so on. But it did not, has not taken any action to undo or do anything with respect to the rate that the. Yeah. That is actually not correct, Your Honor. The agency, when it was informed of the misreporting, went back, investigated. It worked with the Office of the Inspector General to investigate what had happened. Right. It said, we don't have any authority to provide any restitution to the parties that were injured by this, but we're going to ask all the reporting agencies to go back and give us their data that they should have given us in the first instance. And then they went out and they published corrected prices for the entire preceding year and said, not these are rates that, you know, could have, you know, possibly prevailed. These are the rates, these are the corrected rates that would have applied had we known about the proper, had we been, had the proper data been reported to us. What do you think was the purpose of that? Well, they didn't explain their purpose, but I think the only, the only purpose that I could determine, I mean, there is evidence in the record that this is an agency with limited resources. And they said, what they did say is that we're doing this to provide guidance to the market about what the appropriate prices would have been. And they simultaneously, you have to read that against what the OIG report said, which is we don't have a process in place to provide restitution to the parties that were injured by this. Are you still saving five minutes? No. I do want to make the question. You can answer the question from Judge Rawlinson. You can use your time. Yes. That's okay. I understand your answer. I don't want to use your time. Right. Well, I do want to make one more point affirmatively, even if it's cutting into my rebuttal time, and that is that with respect to the second. I control the rebuttal time. Okay. So don't listen to him. With all respect. I want the rebuttal time. You may get more, you may get less. One point that I really do want to make affirmatively is with respect to the effect of the agency's determination that there was misreporting and what the, what that means. I mean, in E and J Gallo, what I didn't get to is the very last point, which is the court at the end of the opinion said, wait, some of these, some of the plaintiff's claims depend on an allegation of misreported rates and fictitious transactions. To the extent there are misreported market rates, those are not FERC-approved rates, so we're going to remand to the district court. Most of these cases, plaintiffs can't proceed with. But to the extent that plaintiff's claims are based on misreported rates, those are not FERC-approved rates. That's not quite what they said. They said that they're, to the extent the rates are part of the FERC structure, you can't do it. But to the extent they are not, and that, the question in this case is whether anything that happened here fits within the category that you've just described. And I'm not sure it turns strictly on misreporting. Okay. I was, and, and, the other, the other thing. The agency said the rates were erroneous. In this case, absolutely, yes. And they, they, they corrected these. Well, the other complication is not everyone gave corrected prices, too. So it's, it was. Right. After, after, certainly going back beyond that first year, they didn't. But the other, the other point I want to make about it is Clipper Express is the other case from the Ninth Circuit where the court said, look, we have an indication from the agency about what the correct rates would have been. And there is no remedy for plaintiffs in the agency. And where both of those factors are present, they can proceed in court with their claim. And in County of Stanislaus, plaintiffs, you know, were trying to get under that same umbrella. And they said, hey, under Clipper Express, you don't have to worry about the filed rate doctrine. And the, and the court said, no, Clipper Express will only apply where two conditions are present. Where there's some indication from the agency about what the correct rate would have been, and where plaintiffs who have been injured have no recourse in the agency. And both of those conditions are, are clearly present here. Okay. I'll give you some time on Roboto. Thank you, Your Honor. Good morning. May it please the Court. My name is Chip English. I represent Dairy America. I'd like to expressly reserve one minute for my colleague, Ben Galapagos, for California Dairy. Good luck. He's generous there. Let me ask you this first question I ask the other counsel. What would be the one source that best describes the milk setting price procedure? What would it be? Zuber v. Allen. Zuber? Zuber v. Allen from 1960s. Yeah, but that's, there's been so much new law since that point. I don't think it's really fair. I would say either the Cloverland case or the Arkansas dairy cooperative case. Okay. The Cloverland? Cloverland. Okay. Greenspring. Thank you. Judge Wu, I understand that there's been a lot of water in the bridge, but actually in the 1960s, we were using end product pricing at the time. So we went somewhere else in between and we ended up here in 2000. So actually what Zuber discusses is very similar to what's done today. Yeah, but not the intricacies. The problem is the intricacies here are somewhat important. For example, this yield part, all that stuff, the make allowances, all that stuff is more or less unfathomable. And I was just wondering where I could look to figure out what they mean. Unfathomable is a good word. Let me start by saying that unlike all the cases Carla has cited, this is actually a case where the Federal agency, USDA, has fixed the price pursuant to statute, 7 U.S.C. section 608C. And it does so. It's only fixed the bottom price. It hasn't fixed the price other than the bottom price. It fixes the minimum price, but that is precisely ultimately what Carla is challenging is the minimum price. They are not challenging, as in ice cream liquidators, a price that's above the minimum price. And so they are challenging the blend price that is established by USDA based upon class prices allocated to volumes of milk. That is what they're challenging. They are not challenging the NAS prices. They sort of mix and match. But in essence, they are not challenging the NAS prices. They are challenging in order to establish their damages. And the point of the filed or fixed rate doctrine, if you would, under Montana Dakota, page 251, where the agency fixes a rate, is that you can't recalculate the damages. The court lacks the authority to recalculate the damages. But it don't have to because the USDA has gone back and based on the data that was provided has set what the price should have been. Actually, what they did, Judge Fischer, was they told us in a historical look back what 24 months would have looked like. But they expressly said, first of all, that there could have been reallocation of volumes of milk, which would have changed it because of the economic circumstances. But also, harking back to a comment you made earlier, Judge Fischer, it defies common sense that each of those months would not have affected future months. This complex system would have affected future months. I don't either. You may have wished I said that. I didn't mean in this case. I meant in an earlier case. But regardless of the point. Oh, I see what you're saying. The point is, the point is this is like a horse race. And after the fact, you can't just pick the horse or the 24 horses out and say, oh, because of this one event, they would have finished this way. And USDA doesn't say that. They just say these are the estimated impacts. And counsel for Carlin called it guidance. The whole point is that you don't interject into the rate-making process by the agency where the agency itself has not elected to do so. The agency here has elected to do so. Once that is done, the situation is different from the normal application of the fixed rate, sorry, the filed rate document. Actually, Judge Wu, what the agency did here, and it's in the excerpt of record, page 33, is it says the pools remain closed. They have changed none of those rates. If you go back to the AMS website. Because all the money in the pools was gone, isn't it? Are you talking about the pool payments? Yes. But the money was already gone, so they couldn't do anything at that point in time. That is a fact. That's no dispute. That's different from saying that there is no remedy where certain defendants have engaged in misreporting. They could have done something in April 2007, the very month all of these events occurred. At that month, they knew during the month while the pools were still open, because they don't close until May 17th, that they knew what the prices should have been, but they didn't adjust the prices that had already been announced in March for Class 1 and Class 2, even though they then used the corrected prices for Class 3 and Class 4. So that is the clearest example of what the agency actually intended to do as opposed to this publication in June 2007. Class 1 and 2 is dependent upon the prices set for Classes 3 and 4. But one is set in advance and one is set retroactively. Yes, but it's just a formula. And so — It's a formula, though, that is set by statute. And let me go back to a very important point here. But why is it so difficult to do the calculation if the formula is set by statute? It's actually not set by statute. It's set in the regulations which follow suggestions that are contained in the statute. But the agency had, assuming Carlin is right and it has effectively rejected Ab initio, which I don't think they did, all they said is those rates were wrong. They didn't actually reject them ab initio, which is the language of American trucking. They didn't reject them. They said that they were wrong, but they didn't say as a result of being wrong we're going to do anything about it. And, in fact, the one month they had a chance to do something about it, which was April, they didn't. That doesn't mean, however, that the file date doctrine precludes it at that point. Well, it precludes it because in Montana, Dakota, the Supreme Court expressly said where the agency lacks the ability to provide reparations, courts shouldn't step in and provide indirectly what the agency can't provide directly. So it's actually an important point for Montana, Dakota, with respect to that issue. So it's your argument that there should be no remedy for this admitted harm that's been done to the plaintiffs? Alleged harm. But that's correct. You haven't denied that they misreported the prices? We've never gotten that far in this case, Your Honor, as to what was going on and how it happened and whether it was even wrong. Let's remember, these were voluntary reporting. It was entirely voluntary. But going back to Mr. Brown's point, the rulemaking issues have been voluntary. Sorry. Which part was voluntary? The reporting to Nass was voluntary because at the time there were no regulations requiring the reporting. So what was USDA's role at that point? Well, as to the Nass reporting, they were accepting voluntary reporting. But USDA, AMS, had the ability, pursuant to the equivalent price provision, .60, which was reestablished in 2000, to evaluate those prices. And contrary to what Carlin argues on reply. You started out by saying they fixed the prices. The agency fixes the minimum price. Based on the reporting. Based on more than the reporting. But if there was no reporting. They start with the rulemaking. If there was no reporting, there couldn't have been any prices set, could there? No, Your Honor. They could have used provision. If there was no reporting or if they thought the reporting was wrong, they could use the equivalent price provision of .60 in each of the Federal orders to establish a price using the dairy market news the way they've done it for 18 times in the past. They had that ability. They didn't use it. But that's lax oversight. And under Hua Chang, that doesn't matter. The real rulemaking they're challenging here is the rulemaking that USDA used in the 1990s to use NAS prices in the first instance when those NAS prices weren't going to be collected in some mandatory fashion. But that's not the right lawsuit for that. The lawsuit for that was to challenge USDA in establishing that. But that was USDA's exclusive opportunity. And it took it. And no one challenged it. I want to go to E&J Gallo, if I may, because obviously we do agree with the district court. And the fact of the matter is that there were plainly allegations about market-based rates in E&J Gallo, which this circuit found were protected. They were protected because FERC had established a mechanism by which market rates could be charged, even if they were manipulated. In other words, manipulated or misreported doesn't really matter. The court used the term jurisdiction. These NAS rates were within the jurisdiction because the regulations decided to use them. Whether or not they should have used them, whether or not they should have been voluntary or mandatory was all and remains within the exclusive authority of USDA. And that's one of the key prongs of the filed rate doctrine. Another key prong is discrimination. If this court were to reverse and allow this case to go back to the district court to determine that there may be some wrongdoing, and assuming the district court found that Dairy America acted incorrectly, and assuming that there were damages awarded, those damages are going to come out of processors for nonfat dry milk, but only the segment that are Dairy America. The statute, 7 U.S.C. 608C, requires both uniform payments to producers and to uniform payments by processors. We call them handlers. But the benefit of the whole statutory scheme is for the producers, in other words, the dairy farmers. It wasn't created, the statute wasn't created to benefit the handlers. But part of the benefit for the farmers is to ensure that processors pay uniform prices. And if they aren't paying uniform prices, that undermines the farmers. In fact, it undermines the very farmers who are the members of the dairy farmer cooperatives of Dairy America. But if the problem is brought about by a certain portion of the handlers who misreport, it's like saying, you know, I'm an orphan because I shot my parents. But the statute doesn't say uniform pricing as to handlers unless somebody acts incorrectly. The statute says uniform prices to all handlers. It doesn't give an exception. That's precisely the point of the filed or fixed rate doctrine. That's not really all handlers within the particular jurisdiction of the FMMO. Excuse me, Judge Wu? Only the handlers within the jurisdiction of the FMMO. Because there are jurisdictions that don't even have these price settings, like California. California has a separate state system. Yes. Yes, Judge Wu, you're correct. But nonetheless, the majority of the entities that were members of Dairy America at this time were subject to the FMMO. And if damages are awarded, you are effectively awarding damages out of those handlers, which will lead to discriminatory pricing. And they were the ones who benefited from the misrepresentation. We don't know if they benefited. I mean, what we know is that they arguably paid, if the allegations are true, they arguably paid less for the milk used for that product, but so did their competitors, who will not be changed. But their competitors weren't responsible for the mispricing. And I can't deny that, Judge Fischer. But what I can say is the statute doesn't provide a distinction. It's all handlers. I think the orphan analogy is pretty good. I'm sorry, Judge Fischer. I assume the orphan. It sounds like the orphan analogy is pretty good. It may be good, but. We're protected because if we get caught, our competitors get an advantage over us. But if there's a complaint, then you have to go back and look at the statute, Judge Fischer. You don't get to rewrite the statute. Well, perhaps that can be done in the process of sorting out whether or not there's a remedy, whether or not there should be a plaintiff should prevail. I'm not convinced that that's a reason to apply the filed rape charge. Isn't that exactly the – I'm sorry, Judge Robertson. Isn't that exactly the exclusive authority that Congress gave to USDA? Isn't that the underlying purpose of this doctrine? There's a difference between deciding that the filed rape doctrine applies and what the effect is in this situation where there's been misconduct or alleged misconduct. Well, misconduct is a strong word, Judge Wu. I mean, there is no allegation that there was intentional acts. But I actually go back and look at Regoland. In Regoland, there was an allegation of fraud. And even though there's fraud, the filed rape doctrine applies. Well, because of the – but there was no – in that situation, to refresh my recollection, the agency didn't come out and say, oh, yeah, there's been a fraud here. We're challenging for finding, you know, the rates that were set were erroneous, which is what was done here. But the agency didn't say there was a fraud here. In fact, the OIG report, they cited, said there was no evidence of a willful violation. And the agency expressly hasn't reset those prices. It just hasn't. It's ultimately going to leave – Well, let me ask you, why would it at this point in time? Because they can't do anything at this point in time. Well, but if – And they may decide that it's up to the courts to decide whether or not there should be a remedy at this stage. And would you admit that the filed –  speaks to it. We don't know that because of the – this is a – the decision was made at this early stage of the proceeding. We don't know whether or not the damages will be speculative. There's no evidence of it. We know that you can't simply rely on this 24 months of data. USD itself said there's reallocation of product. And we know it defies common sense to say that the first month wouldn't have affected the second through the 24th months, and the second month wouldn't have affected the third month. I didn't see that in the district court's decision. But this Court has the power to affirm based upon this argument. I mean, just because the district court didn't apply that doesn't mean it wasn't correct. I don't see the evidence of it is the problem. Well, the evidence of it, at least in excerpt of record page 33, where USDA for itself said that it did no analysis for the reallocation of volumes of milk as a result of different prices. That by itself means that those prices will not be the prices. And what you're asking the district court or a jury to engage in is speculation about what those prices will be. Well, then how could the agency find that there was an understatement by $50 million then, during the period from April 26th to April 2000? It said that that was an impact. But, Judge Wu, that's a static world. That is not the world that we live in. If it was that simple, we wouldn't have questions about the dairy industry like we do. It's just not that simple. Counsel, may I ask you the question I ask opposing counsel? What do you think was the purpose of publishing the corrected prices? I think we've put in our request for official notice requests by Senators for some kind of estimate. And the date of that request and the date of USDA's response, I think, answers the question. It was answering a political question, Judge Rollins. I see my time is up. If you have any questions. He has a minute. He has a minute. Well, he doesn't have a minute. Hey, folks. The reason I'm sitting here is to take notes, and I give you a minute. I'll give you, actually. You don't give co-counsel any time. Oh, I'm sorry. He has a minute. Him. Him. Him. All right. Actually, the reason they're here is to keep me on track. May it please the Court. My name is John Blahos. I represent California Dairies, Inc., and I've been waiting for a long time for this minute, so I'm glad I've got it. Well, use it up. I think if one were to just sort of sit back and review the filed rate doctrine, a distinction has to be drawn between the types of cases in which a rate is filed and it becomes the rate unless it's reviewed. And there, some courts have argued that there has to be either a meaningful review of a rate that a private party has filed before it becomes a legal rate or at least the power to meaningfully review. It is different, however, when Congress has granted authority to an agency to set a price. Congress has gave to the USDA and to the Secretary of Agriculture the authority to set prices. What's under attack here is not the reporting, the misreporting of prices to the NASS. What's attacked here is the federal milk marketing order price. Once that price is set, it cannot be collaterally attacked. You know, in every case in which the filed rate doctrine has been applied, the allegation below has been, and is often accepted as true because they came up with motions to dismiss, that that rate was set by reason of fraud, violation of antitrust laws, breach of the ICC-approved contracts, and so forth. I think the important point that was said in Gallo is from the foregoing review of the filed rate doctrine and associated principles of federal preemption, we can derive the following principle. To the extent that Congress had given, in this case FERC, authority to set rates under the NGA and FERC has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally attacked. Kennedy. If they've exercised that authority. Pardon? It says if they've exercised that authority. They exercised the authority to set prices. It's the FML price that was set. That authority was granted to the USDA, to the Secretary, and the prices were set. True, they were set by a formula, but that doesn't make any difference. The price was set by a federal agency that had the authority to determine that price. The NASS, these voluntary reports, are one input. The fact that they may have been wrong, the input may have been wrong. It's not alleged they were wrong intentionally, but they may have been wrong. But that's not the point. The price that was set is the FMO price. And the file rate doctrine says if that price was legally set by an agency that has the power to do it, then that's the end of the matter. It cannot be collaterally attacked. Okay. Thank you, Your Honor. Thank you. You can have two minutes. Thank you, Your Honor. Appellee counsel made the point that all that NASS did was some sort of rough estimation of what the damages are. That's simply not true. And the language is not equivocal about what the effects of this misreporting were. In the record, at excerpts of record 31 to 35, you can find the actual statements of the AMS. And what they said was that this report provides the impacts these revisions would have had for the federal order system. And then they go on to find, to the dollar, it wasn't even $50 million, it was $40 million, $700 and something thousand, right down to the dollar of what the actual effects were that were negative effects for producers of milk. And that's consistent in both the OIG report and the AMS report. It's not equivocal. They do have what amounts to basically a bullet point footnote about how there's a possibility of some reallocation. But that didn't stop them from doing this whole detailed analysis of what the effects would have been. And to try to blow that what effectively is just kind of an afterthought about, you know, the possibility that these might not be precise to the dollar and to some larger argument that this is not capable of anything but very gross estimation is wrong. What's the ER site? The ER sites for the OIG report are ER 98 to 114, and the ER 31 to 35 is the AMS statement, restatement of what the rates would have been. There was a point made that this four-week look-back could have afforded an opportunity to at least for one month correct the prices, but that ignores the fact that the previous month's prices had already been averaged. And under AMS policy, which you can find on their website, they say that even if there are revisions subsequent to that that we list in our four-week look-back, we don't touch any average prices we've already published. So that's just not an issue. Doesn't that hurt your argument? What? Doesn't that hurt your argument that the agency has said that? Perhaps I'm speaking too quickly. I'm just talking about this. They call it a four-week look-back in their briefing. It's this policy that every Friday they produce this report that just talks about the previous four weeks' surveyed prices. And the idea that somehow in that report they could have corrected the previous prices and then gone forward and affected the actual pool is just not true based on existing AMS policy. And all you need to do is look at the OIG report itself, which talks about what the actual findings of the agency were, namely that this was an error. They recognized it as an error as soon as they became aware of it, and they did everything that they could to rectify it, I guess. One more point. One more point. One more point, yes, Your Honor. Make it good. The filed rate doctrine is about deference to agency determinations. And the agency determinations in this case could not have been clearer. The agency did not have the authority to review the accuracy of the prices, but then once they finally had the opportunity to look behind the curtain at what was going on, they said this was an error. This was an error that cost $50 million, at least for the year and the classes we were able to reconstruct for these plaintiffs, and we don't have any power to provide restitution. But what we can do is we can provide corrected prices. And under Clipper Express and the other precedent from this Court, there's nothing that forbids plaintiffs from having a forum to bring those claims and get their deserved recompense. Okay. Thank you. Thank you, Your Honor. Thank you, counsel. It's been an interesting case. We appreciate the arguments, all of them. Please submit it.
judges: Wu, Fisher, Rawlinson